IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LEANDRA FUTCH, on behalf of Plaintiff and the class members described herein,<br><br>    Plaintiff,<br><br>  v.<br><br>MAKWA, LLC doing business as MAKWA FINANCE;<br>LDF HOLDINGS, LLC;<br>MELINDA WALKER;<br>and JOHN DOES 1-20,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  DEMAND FOR TRIAL BY JURY<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiff, LeAndra Futch, brings this action against Defendants (a) Makwa, LLC doing business as Makwa Finance ("Makwa"), (b) LDF Holdings, LLC, (c) Melinda Walker; and (d) John Does 1-20 to secure redress for usurious and illegal loans (such as <u>Exhibit A</u>) made to Indiana residents.

2. Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count II).

### JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 15 U.S.C. § 1692k (FDCPA), 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1337 (interstate commerce), and 28 U.S.C. § 1367 (supplemental jurisdiction). Jurisdiction may also exist under 28 U.S.C. § 1332(d) (Class Action Fairness Act).

4. This Court has personal jurisdiction over Defendants because they:

  a. Knowingly participated in the making and collection of unlawful loans to

Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

        b.     Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5.     Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

6.     Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7. Plaintiff LeAndra Futch is a natural person who at all times relevant has resided in Indianapolis, Indiana.

### Defendants

### LDF Holdings

8. Defendant LDF Holdings, LLC ("LDF Holdings") is a limited liability company that claims to be wholly owned, indirectly, by the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "LDF Tribe"). Its website claims that "LDF Holdings owns and manages the entire online lending business." (https://ldf-holdings.com/about) (Exhibit B) As set forth below, that is not true.

9. The LDF Tribe is a small, isolated, and economically depressed Indian Tribe located in rural Wisconsin.

### Walker

10. At the time of the loan complained of, Defendant Melinda Walker was the Director of Lending Operations of LDF Holdings, LLC. She was previously the Account Manager for LDF Holdings LLC. (Exhibit C)

11. As Director of Lending Operations, Walker conducted the high-interest lending activities complained of herein, and directs and controls the lending activities, policies and practices of LDF Holdings, LLC.

### Makwa, LLC doing business as Makwa Finance

12. Defendant Makwa, LLC doing business as Makwa Finance purports to be a limited liability company chartered under the Laws of the Lac Du Flambeau Band of Lake Superior Chippewa Indians. It conducts online lending at high interest rates, in excess of 600%. It does business via its website, https://www.makwafinance.com.

13. Makwa, LLC doing business as Makwa Finance claims to be "a commercial

enterprise and instrumentality of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized sovereign Indian nation (the 'Tribe') . . . ." (Exhibit D, p. 5)

14. In fact, as described below, the principal economic benefit of the activities of Makwa, LLC doing business as Makwa Finance is received by non-Native American persons.

### John Does 1-20

15. Defendants John Does 1-20 are other persons and entities that participated in the lending activities described herein.

### GENESIS AND NATURE OF LENDING SCHEME

16. An article published in the LDF Tribe's newsletter, *Inwewin*, in July 2013 noted that the tribe had embarked on a new internet lending business. The article stated that "some view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations." The article also stated that "the Tribe has partnered with one of the largest and most experienced lending companies." (Exhibit E)

17. Lacking both capital and experience, and in desperate need of money, the tribe attempted to rent out one of its few remaining assets – its sovereign immunity – to non-tribal persons and entities who agreed to pay the LDF Tribe a small percentage of each loan as a fee or commission.

18. Within a short period of time, the LDF Tribe became one of the most prolific suppliers in the rental market for sovereign immunity, making "rent-a-tribe" agreements with over 50 different non-tribal investors.

19. The LDF Tribe received between one and three percent of revenues from each of these lenders in exchange for the use of its name.

20. Loan approval was made by the non-tribal owners of each lender. Electronic documents were transmitted to a representative on LDF tribal soil in Wisconsin, who rubber-stamped approval for the loan while technically on the LDF Tribe's reservation. The loans

are then funded from bank accounts to which the tribe has no access, and the loans are serviced and collected by nontribal entities off the LDF Tribe's reservation.

21. Brent McFarland, then the LDF Tribe's director of business development, told the Milwaukee Journal Sentinel that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Cary Spivak, "Lac du Flambeau Chippewa enter payday loan business with eye to online gambling," Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952zl-237906421.html. (Exhibit F)

22. The Tribe thereafter entered into "rent a tribe" arrangements with dozens of non-tribal entities.

23. The role of LDF Holdings is to make it a appear that the lending business was "tribally" owned, in exchange for about 2% of the revenues from the loans.

24. Makwa, LLC doing business as Makwa Finance makes loans through its website (Exhibit D) to consumers at interest rates in excess of 450% annually.

25. Makwa, LLC doing business as Makwa Finance does business in Indiana over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

26. Many of the loans made by Makwa, LLC doing business as Makwa Finance are made to Indiana residents, including LeAndra Futch.

27. These residents have received funds via ACH transfers into bank accounts located in Indiana. The loans also provide for repayment via ACH transfers.

28. At the time of the loan at issue, Makwa, LLC doing business as Makwa Finance's website specified a list of states in which it made loans including Indiana.

29. Makwa, LLC doing business as Makwa Finance – and the Defendants actually conducting the lending operation – thus affirmatively sought out and targeted Indiana residents for such loans.

30. The funds lent are transferred by ACH credit to the borrowers' bank accounts

in Indiana.

31.     Repayment of the loans is made by ACH debit from the borrowers' bank accounts in Indiana.

## LOAN TO PLAINTIFF

32.     On or about May 27, 2022, Makwa, LLC made a $500 loan to Plaintiff. (Exhibit A) The loan would result in repayment of $2,291.22 if paid every two weeks for 8 months.  The total interest charged would be $1,791.22, which according to Makwa, LLC equates to an annual percentage rate of 649%.

33.     The loan agreement is a standard form.

34.     The loan was made for personal purposes and not for business purposes.

35.     The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

36.     The loan was made entirely via the Internet.

37.     The loan was to be repaid via ACH.

38.     Plaintiff made some of the payments, including interest.

39.     Makwa continues to attempt to collect the balance.

40.     Makwa's lending does not actually occur on the Tribe's reservation.

41.     A significant majority of the transaction occurs within the State of Indiana  – applying for the loan and receiving and collecting the funds.

42.     The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

43.     Plaintiff has never set foot on the LDF Tribe's land.

44. Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

45. An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

46. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

47. An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

48. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

49. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

50. Further, sovereign immunity, even if legitimately invoked, still does not turn an

otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

51. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## INDIANA REGULATION OF LENDING

52. The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans. It provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

53. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> > (a) the total of:

> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
>
> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
>
> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
>
> (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

54. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize 788.67% rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

55. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

> (1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.
>
> (2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).
>
> (3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).
>
> (4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

56. The amount of finance charge provided for in Exhibit A is more than double that permitted in Indiana under any provision.

57. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

> (1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals,

made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

> (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.
>
> (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.
>
> (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.
>
> (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

> (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and
>
> (b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

> (a) An agreement that the law of another state shall apply.
>
> (b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

>    (c) An agreement that fixes venue. . . .
>
> (8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

58.     Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

> . . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.
>
> (4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .
>
> (7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.
>
> (8) In any case in which it is found that a creditor has violated this Article, the court may award **reasonable attorney's fees** incurred by the debtor. . . . (Emphasis added)

59.     LDF Holding is aware from prior litigation and warnings by state authorities that its lending operations are illegal. E.g., Washington Department of Financial Institutions notice. (Exhibit G)

60.     The excessive interest charges imposed by Defendants were willful.

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

61. Plaintiff incorporates paragraphs 1-60.

62. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

63. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

64. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Makwa, LLC d/b/a Makwa Finance at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

65. Plaintiff may alter the class definition to conform to developments in the case and discovery.

66. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

67. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

68. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

69. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

70. Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

71. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i.      A declaration that the loans are void and need not be repaid;

    ii.     Statutory damages;

    iii.    Attorney's fees, expenses and costs; and

    iv.    Such other or further relief as is appropriate.

## COUNT II – RICO

72. Plaintiff incorporates paragraphs 1-60.

73. This claim is against Walker and the Does, who are the RICO "persons."

74. All loans made in the name of Makwa, LLC d/b/a Makwa Finance to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

75. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

76. Makwa, LLC d/b/a Makwa Finance is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

77. Defendants Walker and the Does are associated with this enterprise.

78. Defendant Walker and the Does conducted or participated in the conduct of the affairs of Makwa, LLC d/b/a Makwa Finance through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

79. Plaintiff was deprived of money as a result.

## **CLASS ALLEGATIONS**

80. Plaintiff brings this claim on behalf of a class.

81. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Makwa, LLC d/b/a Makwa Finance at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

82. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

83. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether Makwa, LLC d/b/a Makwa Finance is an "enterprise."

    c. Whether Defendant Walker is associated with Makwa, LLC.

    d. Whether the Does are associated with Makwa, LLC.

    e. Whether Defendants Walker and the Does conducted or participated in the affairs of Makwa, LLC d/b/a Makwa Finance through a pattern of making and collecting unlawful loans.

84. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

85. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

86. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendant Walker and the Does for:

      i.      Treble damages;

      ii.     Attorney's fees, litigation expenses and costs of suit; and

      iii.    Such other or further relief as the Court deems proper.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
EDELMAN COMBS LATTURNER
    & GOODWIN, LLC
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## **DOCUMENT PRESERVATION DEMAND**

      Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.


                                    */s/ Daniel A. Edelman*
                                    Daniel A. Edelman